**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 7** |
| | ) | |
| **RONALD M. MEADE** | ) | |
| **JOHNNIE P. MEADE** | ) | **CASE NO. 08-70942** |
| | ) | |
| Debtors. | ) | |

_____)_____

| | | |
|---|---|---|
| | ) | |
| **W. CLARKSON MCDOW, JR.** | ) | |
| **UNITED STATES TRUSTEE FOR** | ) | |
| **REGION FOUR** | ) | |
| | ) | |
| Movant | ) | **MOTION TO DISMISS CHAPTER 7** |
| | ) | **CASE PURSUANT TO 11 U.S.C. §** |
| v. | ) | **707(b)(1) and (2), or, IN THE** |
| | ) | **ALTERNATIVE, TO DISMISS UNDER** |
| **RONALD M. MEADE** | ) | **§ 707(b)(1) and (3)** |
| **JOHNNIE P. MEADE** | ) | |
| | ) | |
| Debtors. | ) | |

_____

**MEMORANDUM DECISION**

Ronald and Johnnie Meade (collectively, the "Debtors") filed a voluntary chapter 7 petition on May 23, 2008, commencing the current bankruptcy case. Subsequently, on August 6, 2008, the United States Trustee filed a Motion to Dismiss the case under 11 U.S.C. § 707(b)(1) ("the Motion") on the ground that the petition was an abusive filing. The Motion was tried on August 6, 2009, after which the Court took the matter under advisement, allowing the parties to submit written arguments. Based on the following findings of fact and conclusions of law, the Court will grant the Motion.

FINDINGS OF FACT

The parties filed a Stipulation of Facts and Issues to be Decided (the "Stipulation") on June 12, 2009, in which they agreed upon the following:  The Debtors are married and on the date of filing their petition in this Court three of the Debtors' grandchildren were residing with them.  On the Official Form 22A (the "Means Test"), the Debtors state their annualized Current Monthly Income as $118,723.56, which exceeds the applicable stated median family income of $87,546 for the Debtors' household of six.[1]

The Debtors are both employed.  Mr. Meade provides technical services for his employer SNF Holding Company, where he has worked for thirteen years, and Mrs. Meade is a teacher for Wise County Schools, where she has worked for twenty-one years.  According to Schedule I, Mr. Meade earns a gross monthly income of $5,965.53 and Mrs. Meade earns a gross monthly income of $3,478.52.  These are the same amounts reflected for gross monthly income on the Debtors' Means Test.  In addition to regular employment income, Mr. Meade also receives monthly income of $417 in pension or retirement income and $32.58 in interest and dividend income.

On Schedule I the Debtors also list various deductions for amounts withheld each month from their paychecks.  For Mr. Meade, $1,439.66 is deducted for payroll taxes, including federal and state income tax withholding, $618.02  for insurance, $1,011.70 for a 401(k) loan payment, $119.30 for a 401(k) contribution, and $250.03 for a medical flexible spending account.  For Mrs. Meade, $1,000.50 per month is deducted for payroll taxes, also inclusive of

---

[1] Although three of the Debtors' grandchildren were living with them at the time of the chapter 7 filing on May 23, 2008, both Debtors testified at the hearing on the Motion that all four of their grandchildren are now residing with them.  Transcript of Trial held on August 6, 2009, at pages 40, 154, and 155.

federal and state income tax withholding, $31.64 for insurance, $40.82 for union dues, $225 for a §403(b) retirement plan contribution and $50 for a deposit account with her credit union.  After these deductions, the Debtors have a combined monthly income of $5,106.96, which, after deducting the average monthly expenses listed on Amended Schedule J, a total of $5,330.19, results in a budget deficit of $223.23 per month.

The Debtors in their Schedule A list two interests in real property, their primary residence in Virginia, valued at $150,798, and a timeshare in real estate located in Myrtle Beach, South Carolina, valued at $10,800.  The Stipulation recites that the Debtors also own the following items of personal property:  a 2008 Nissan minivan valued at $24,000, two retirement accounts with a combined value of $181,884.70, and various bank accounts, life insurance policies, other vehicles,[2] clothing, household goods and furnishings.  The secured claims listed on Schedule D total $183,288.99, which include two deeds of trust encumbering the Debtors' primary residence to secure a petition date aggregate indebtedness of $144,699, a debt of $1,992.99 secured by a computer system, a purchase money loan with a balance of $24,000 secured by the Nissan minivan, a loan with a balance of $1,797 secured by household furniture, and a purchase money obligation with a balance of $10,800 secured by the Debtors' timeshare in Myrtle Beach.   Finally, as noted on Schedule F, the Debtors' unsecured nonpriority claims total $137,066.  Although not mentioned in the Stipulation, Schedule E reveals no unsecured priority

---

[2] Although not specifically mentioned in the Stipulation, Schedule B identifies an inoperable 1985 Ford pickup truck with a scheduled value of $200, an inoperable 1994 Pontiac Trans Am with a scheduled value of $200, a wrecked 1995 Honda Passport with a scheduled value of $200, a 1995 Pontiac Grand Prix with a scheduled value of $1,575, a 2002 Suzuki Aero with 120,000 miles in very poor mechanical condition with a scheduled value of $500, and two utility trailers with scheduled values of $150 each.

claims owed by the Debtors.  Finally, the Stipulation notes that the Debtors "have not and are not engaged in business, and none of the debts arise from business operations."  (Stipulation ¶ 15.)

       With the parties having agreed to the foregoing, the matter proceeded to trial, during which Ms. Karen Kidd[3] and both Debtors testified.  The testimony offered at trial concerned various contentions raised in the United States Trustee's Motion, which are summarized in the following section of this Memorandum Decision.  Mr. Meade first testified about his income from SNF Holding Company.  In addition to his regular salary, Mr. Meade receives a "yearly bonus . . . in February."  Transcript of Trial held on August 6, 2009, at page 27, hereafter referred to as "Trial Transcript."  Mr. Meade testified that his 2009 bonus was $9,000.  In February of 2008 he received the same amount.  In February of 2007 he received $8,500.  These amounts are the total bonuses awarded without reduction for income tax withholding purposes.

       Mr. Meade then testified about the circumstances of the Debtors' transportation situation.  Mr. Meade testified that his employer provides him a vehicle and although his employer pays the maintenance, insurance, and fuel costs, Mr. Meade uses this vehicle for personal use "most of the time."  (Trial Transcript at 30.)  However, Mr. Meade testified that personal use of the vehicle is taxed to him as part of his compensation.  According to the earnings statement for Mr. Meade for the period ending on December 16, 2007, which was within the six month period preceding the bankruptcy filing as defined by 11 U.S.C. § 101(10A), he received compensation designated as "auto" in the amount of $501.06 and a corresponding

---

[3] Ms. Kidd is a paralegal in the office of the United States Trustee and her testimony was offered to support the United States Trustee's calculations regarding the Debtors' monthly income and disposable income.

4

deduction of the same amount as being withheld by the employer for the same designated reason, "auto." Debtors' Exhibit 3, Earnings Statement for Mr. Meade for pay period ending December 16, 2007. The Court finds that Mr. Meade's employer provided additional compensation to him for the deemed value of his personal use of the company vehicle, which compensation was withheld from what he actually received as payment to the employer for such non-business use of the car.

Mr. Meade then testified about his wife's transportation. Although Mrs. Meade was primarily using the Debtors' Suzuki before the purchase of their Nissan minivan in 2008, Mrs. Meade now uses the minivan for nearly all of her driving. The Debtors' thirty-eight year old son presently uses the Suzuki "most of the time." (Trial Transcript at 32.) The Debtors do still own the Suzuki and pay the cost of insuring it, but Mr. Meade testified that "it's not very dependable." *Id*. Additionally, because the Debtors' son does not live with them, the Suzuki is ordinarily in his physical custody "most of the time." (Trial Transcript at 54.) However, upon further inquiry by Debtors' counsel, Mr. Meade clarified that at the time of the bankruptcy filing, the Debtors drove the Suzuki and any prior testimony was as to the present circumstances of the Debtors.

Based on the testimony of the Debtors, it is not precisely clear what the Suzuki's operating status was on the date of the bankruptcy filing. Mr. Meade testified that "[t]he Suzuki just kind of wore out, broke down" and was in that condition when the Debtors purchased the Nissan minivan. (Trial Transcript at 31, 55.) Mr. Meade testified that the purchase of the

minivan was "right, very near the time" the Debtors filed bankruptcy. (Trial Transcript at 51.)[4]

Sometime after the minivan purchase the Debtors' son worked on the vehicle and made it

operable, although "it doesn't have an air conditioner . . . [or] heater." (Trial Transcript at 56.)

Presently it appears that the Suzuki provides basic transportation only, for which it is still "not

very dependable." (Trial Transcript at 56, 32.)

Additional testimony from Mr. Meade concerned a $50,000 401(k) loan that he

obtained in 2005. Mr. Meade testified that a portion of the loan was used to "put siding on the

house [and] a new roof." (Trial Transcript at 34.) Mr. Meade testified that the Debtors also

"took the family and went to Myrtle Beach" with a portion of the loan. (Trial Transcript at 35.)

Finally, Mr. Meade noted that the remaining portion of the loan was used to enclose the Debtors'

sun room at their residence. Mr. Meade testified that this loan will be repaid in August of 2010.[5]

Following Mr. Meade's initial testimony, Mrs. Meade briefly testified about the

Debtors' timeshare in Myrtle Beach. Mrs. Meade testified that this timeshare was purchased in

or around July of 2007, less than a year prior to the filing of the Debtors' bankruptcy petition.

Although the Debtors were making payments on this timeshare at the time of filing,[6] Mrs. Meade

testified that the Debtors have stopped making those payments, which supports the Debtors'

---

[4] The evidence provided by the parties or otherwise available in the case documentation does not disclose the precise date when the Nissan minivan was acquired.

[5] Counsel for the Debtors likewise noted that repayment of the 401(k) loan will be finished in August of 2010. (Trial Transcript at 13.)

[6] Mrs. Meade testified that payments on the timeshare were "maintenance" of $38.25 per month and repayment on the purchase money loan of $210 per month. (Trial Transcript at 178.) According to the Debtors' Means Test, the amount listed for repayment on the timeshare was an average of $250 per month, exclusive of taxes or insurance. Debtors' Means Test at Line 42, Page 8.

Chapter 7 Statement of Intention providing for surrender of the property.

Following the Debtors' initial testimony, Ms. Kidd testified as the final witness for the United States Trustee's case in chief.  Ms. Kidd testified as to the United States Trustee's suggestion of the need for an amended calculation of the Debtors' Means Test.  Following her testimony, the Debtors again testified.  This remaining testimony touched on additional line item expenses of the Debtors' Means Test that the United States Trustee criticizes, particularly, Lines 25, 30, 32, 35, 39, and 40.

On Line 25 the Debtors listed a monthly tax expense of $2,535.16, which is inclusive of income tax withholding, social security taxes, and medicare taxes.[7]  The calculations by which such amount was derived have not been provided to the Court and its efforts to determine such derivation have not been successful.  Ms. Kidd testified that the average monthly amount of taxes withheld from the Debtors' incomes during the six month period preceding the month their petition was filed is actually higher than such scheduled amount, but that such figure is unreliable because income "taxes are over-withheld."  (Trial Transcript at 98-99.)  Ms. Kidd testified that based on her review of the Debtors' tax returns, the Debtors received combined federal and state income tax refunds in 2008 attributed to their 2007 income tax return totaling $5,451, "which is an average monthly of $454."  *Id.*  Mr. Meade confirmed that the Debtors were entitled to a federal tax refund in 2008 of $5,071 for the 2007 calendar year.[8]  The methodology

---

[7] Their Schedule I figures for such tax liabilities are a combined $2,440.10 per month.

[8] United States Trustee's Exhibit 5, the Debtors' 2007 Income Tax Return prepared by Barbara Rasnick Phipps, P.C., shows a Federal Income Tax Refund of $5,071 and a Virginia Income Tax Refund of $380 owed to the Debtors for the 2007 tax year.  The Debtors' 2008 Income Tax Return shows a Federal Income Tax Refund of $4,505 and a Virginia Income Tax Refund of $196.  Debtors' Exhibit 1, 2008 Federal Income Tax Return and 2008 Virginia

which the Court will employ to determine the proper Line 25 expense under the circumstances

presented here will be to utilize their actual 2008 tax year liabilities for their federal and Virginia

income taxes as reported in their returns for such year, which encompasses the $9,000 bonus

received in February, 2008.  That sum is $18,068.  To this amount will be added the social

security tax ($558) and medicare tax ($130.50) attributable to the $9,000 bonus per United States

Trustee's Exhibit A.  The Court will also add to this total the social security tax and medicare tax

withheld from Mr. Meade's income during the six month period preceding May 2008, the month

of filing, per United States Trustee's Exhibit A and multiply that aggregate amount by a factor of

two to obtain an annual figure.  Adding these annualized amounts yields a total of $23,812.02.

Dividing that amount by twelve provides a monthly average for the Debtors' joint income taxes

and for Mr. Meade's employment taxes.  To this amount will be added the average monthly

amount for Mrs. Meade's social security and medicare tax liabilities as withheld from her

paychecks during the six month period preceding the month of filing per United States Trustee's

Exhibit A.  The final result is $2,280.62, which the Court determines to be the fairest

approximation of their average actual monthly tax expense at the time of their filing.  This

amount is $254.54 lower than the $2,535.16 figure recorded on Line 25 of their Means Test.

On Line 30 of their Means Test, the Debtors listed an expense of $275 per month

for childcare.  Although Ms. Kidd testified that she thinks "that number's probably overstated,

based on the information provided . . . by the Debtors," Mrs. Meade testified that the amount

expended on a monthly basis is actually higher than what was originally listed.  (Trial Transcript

at 87.)  Mrs. Meade testified that the childcare expense calculation was based on the fact that the

---

Income Tax Return.

"children go to day care after school, and the price is six dollars a day for each child for day care." (Trial Transcript at 161.) Mrs. Meade testified that if the children stay longer than what basic after school day care covers, the cost is "fifteen [or] sixteen dollars a day for that . . . per child." *Id.* According to Mrs. Meade's testimony, the Debtors' oldest grandson is not included within this calculation but for the occasional situation where he has an after school appointment or event where he needs to wait on Mrs. Meade to transport him. Nevertheless, Mrs. Meade testified that Ms. Kidd's reliance on the Debtors' tax returns, which led to the United States Trustee's concerns with the amount listed for childcare expenses, is misplaced. Mrs. Meade testified that "the expenses that were shown on [the Debtors' income tax return] were not indicative of actually how much [was] spent." (Trial Transcript at 162.) Mrs. Meade testified that as of the trial date (August 6, 2009), the Debtors had already "spent right at a thousand [dollars]" on childcare expenses for the year, and she noted that the children had just gone back to school on the day of the trial. *Id.*

On Line 32 of their Means Test the Debtors listed an expense of $250 for telecommunications. Mr. Meade testified that he has a company telephone and a personal telephone. His personal telephone is part of the Debtors' mobile telephone package, which includes five mobile telephones, the one for Mr. Meade, one for Mrs. Meade, two for the oldest two grandchildren, and one for the Debtors' adult son. Mr. Meade testified that the cost for this telephone package started "out as a family plan, $79.99." (Trial Transcript at 200.) Mr. Meade testified that the cost "is $9.99 a month for each added phone beyond two." (Trial Transcript at 200-201.) Mr. Meade then testified that the cost "adds up to an average of $170 a month," although he noted that "it has been as high as $220, $230" per month when the grandchildren

downloaded something on the phone.  (Trial Transcript at 201.)  Mr. Meade testified that the

phone plan has unlimited text messaging and fourteen hundred minutes per month.

Mr. Meade also testified that the Debtors have a land-line telephone at their home

in addition to the mobile telephones.  Mr. Meade testified that "it's unlimited long distance, and

it was supposed to have been seventy-nine dollars, and it's always a hundred or a hundred and

ten."  (Trial Transcript at 232.)  However, Mr. Meade noted that the land-line had "one

additional [line for the computer that was] fourteen dollars or five dollars for an extra line."

(Trial Transcript at 232.)  When asked what the necessity was for all of these telephones, Mr.

Meade noted that the Debtors do not "get real good service where [they] live always on the cell

phone."  (Trial Transcript at 232.)  Mrs. Meade also noted that the reason for the several

telephones, in addition to the land-line telephone, was because "it was the best way to protect"

their grandchildren due to the instability of the grandchildren's parents.  (Trial Transcript at

195.)  Mrs. Meade testified that allowing the two oldest grandchildren to have a telephone

provides that in the event there was an emergency, the grandchildren will have the ability to

contact her.                                On Line 35 of their Means Test the Debtors listed an

expense of $208 for the continued contribution to the care of household or family members.  Ms.

Kidd testified that the number should be reduced to zero because that expense line "is for care of

a household [or] family . . . member who is chronically ill, disabled, or elderly, and that's not the

case in this situation."  (Trial Transcript at 88.)  Ms. Kidd testified that the United States

Trustee's office had "received no medical documentation . . . to substantiate" the Debtors' claim

of a $208 expense for contributions to their son.  However, at the hearing Mr. Meade testified

that his son suffers from bipolar disorder.  Mr Meade testified that his son's bipolar disorder was

"recognized, around twenty-five years of age." (Trial Transcript at 37.) Mr. Meade also testified that his son self-medicates with alcohol and is an alcoholic. Mr. Meade testified that as a result of these ailments, the Debtors have regularly supported him. Mrs. Meade likewise testified that their son "has been institutionalized on two occasions, from really bad episodes that he was going through." (Trial Transcript at 153.) Mrs. Meade also testified that "it's difficult for [their son] to keep a job, steadily." *Id.*

Finally, the Debtors listed an expense of $100 on Line 39 and an expense of $10 on Line 40. At trial, counsel for the Debtors conceded that the Debtors "should not have had it at one hundred dollars" for Line 39. (Trial Transcript at 22.) Counsel noted that the Debtors "are limited to fifty-nine dollars additional grocery expenses" on Line 39. *Id.* However, Ms. Kidd testified that she "did not see where [receipts provided by the Debtors] exceeded the IRS allowed amount." (Trial Transcript at 118.) With respect to Line 40, Ms. Kidd testified that the United States Trustee's office "never received any documentation to support monthly charitable contributions." (Trial Transcript at 85.) However, Mrs. Meade testified that "we always have lots of things that come up [because she works] in a public school." (Trial Transcript at 169.) Mrs. Meade testified that kids often "come in and want to sell something to raise money for Boy Scouts, or Girl Scouts." *Id.* Mrs. Meade testified that "sometimes . . . faculty and staff will have a jeans Friday, where you have to pay five dollars to wear a pair of jeans, but the money is taken up, and it goes for the Relay for Life." *Id.* As Mrs. Meade noted, "there's always something that is coming up. So you know, ten dollars is always eaten up, at least ten a month." *Id.*

According to the Debtors' Means Test which they filed with their petition, they had a *negative* monthly disposable income at the time of filing of $1,143.55. The Court finds

11

that the Debtors' financial obligations are primarily consumer debts.

## CONTENTIONS OF THE PARTIES

The United States Trustee moves the Court for dismissal of the Debtors' case as an abuse of chapter 7. The United States Trustee notes that the Debtors' obligations are primarily consumer debts, which the Debtors themselves concede, and the United States Trustee contends that the presumption of abuse arises under § 707(b)(2). Alternatively, the United States Trustee contends that dismissal is warranted under § 707(b)(3), which allows the Court to dismiss the Debtors' case if the Court finds that it was filed in bad faith or the totality of the Debtors' financial situation demonstrates abuse.

With respect to § 707(b)(2), the United States Trustee contends that the Debtors' Means Test, as calculated by the Debtors, is erroneous. First, the United States Trustee contends that the gross income reported by the Debtors on Line 3 was incorrect and should be increased, from $5,965.53 to $7,473.44 for Mr. Meade and $3,478.52 to $3,881.64 for Mrs. Meade. Second, the United States Trustee contends that a number of errors were made in deducting expenses. The United States Trustee contends that the amount of $22 listed on Line 21 ("Local Standards: housing and utilities; adjustment."), which is designated as "internet needed for work," should be eliminated and included on Line 32 ("Other Necessary Expenses: telecommunications services."). On Line 24 ("Local Standards: transportation ownership/lease expenses; Vehicle 2.") the Debtors listed $489 for a second vehicle, however, the United States Trustee contends that this expense should be reduced to zero because the Debtors only pay ownership expenses on one vehicle. The United States Trustee contends that reductions should

also be made on Line 25 ("Other Necessary Expenses: taxes."), from $2,535.16 to $2,335.16,

Line 30 ("Other Necessary Expenses: childcare."), from $275 to $150, and Line 32 ("Other

Necessary Expenses: telecommunication services."), from $250 to $72.  The United States

Trustee contends that similar reductions in the category of "Additional Living Expense

Deductions" should be made at Line 35 ("Continued contributions to the care of household or

family members."), from $208 to zero, Line 39 ("Additional food and clothing expense."), from

$100 to $59, and Line 40 ("Continued charitable contributions."), from $10 to zero.  Based on

these adjustments the United States Trustee contends that Debtors have a minimum of $1,617.64

in monthly disposable income, which after multiplying by sixty, is significantly higher than the

statutory amounts provided in § 707(b)(2)(A)(i)(II).  Accordingly, the United States Trustee

contends that dismissal is warranted under § 707(b)(2).

        With respect to § 707(b)(3), the United States Trustee contends that even if the

presumption of abuse is rebutted, the Court may still dismiss the Debtors' case if it finds that the

Debtors filed in bad faith or the totality of their financial circumstances demonstrates abuse.  In

support of this contention, the United States Trustee notes that Schedules I and J include

deductions from income and expenses which are excessive, overstated, or both.  As an example,

the United States Trustee specifically lists the 401(k) loan repayment of $1,011.70, the $50 for

savings at a credit union, $250 for telephone expenses, $210 for payment on the timeshare unit

which the Debtors have surrendered, and the $38.25 maintenance fee for the timeshare the

Debtors surrendered.  (Motion ¶ 11.)   Additionally, the United States Trustee contends that the

Debtors engaged in a "reckless spending pattern," which led to their bankruptcy filing.  (Motion

¶ 12.)  As an example the United States Trustee points to the Debtors' purchase of the new

minivan the month they filed bankruptcy, upon which they still owe $27,476.  Given these

factors, the United States Trustee contends that the Debtors would have the ability to pay

unsecured creditors, which the United States Trustee contends is an abuse of the provisions of

chapter 7 within the meaning of § 707(b)(3).

   In response to the count of the Motion seeking dismissal pursuant to § 707(b)(2),

the Debtors contend that their Means Test was properly prepared.  The Debtors note that the

household size of the family has increased by one child.  Additionally, the Debtors contend that

Mrs. Meade's income is properly reported because she does not receive income during the

summer months and an adjustment was therefore made.  The Debtors also contend that the

adjustment for housing and utilities and the adjustment for ownership/lease expense are properly

taken.  The Debtors contend that the ownership/lease expense is supported by a majority view of

the courts considering the issue.  Finally, the Debtors contend that the deductions taken for taxes

were based upon historical figures in order to avoid underpayment to the Internal Revenue

Service and that these deductions were in effect for a number of years prior to the filing.

Likewise, the Debtors contend that the remaining expenses that the United States Trustee takes

issue with, namely, Lines 32, 35, 39, and 40, were properly reported.  However, with respect to

the United States Trustee's contention that childcare expenses should have been reported at

$150, rather than $275, the Debtors offered no response in their written pleading.  Nevertheless,

based on their calculations, the Debtors contend that no presumption of abuse arises.

   With respect to the United States Trustee's contention that the case can be

dismissed under § 707(b)(3), the Debtors contend that given the particular circumstances of their

situation, the decision to file in chapter 7 should be affirmed.  The Debtors again note that an

additional grandchild has been placed in their custody, bringing the number of grandchildren in their custody to four.  The Debtors also contend that the deductions and expenses on Schedules I and J are properly reported.  Finally, the Debtors contend that although they explored alternative avenues to the purchase of the minivan, given the number of grandchildren and that prior transportation was unreliable, the acquisition of the minivan was necessary and beneficial for the family.

Following the August 6, 2009 hearing the parties filed memoranda in support of their respective positions.  In the United States Trustee's closing brief and reply, the United States Trustee reaffirmed the contention that the Debtors' Means Test disposable income was erroneously calculated.  The United States Trustee highlights three examples.  First, although the Debtors had reported income of $9,893.63 on Schedule I and used that amount in completing the Means Test, the United States Trustee noted that Mr. Meade's yearly bonus was not included[9] and Mrs. Meade's income for the six months preceding the bankruptcy filing should have been reported as $3,881.64, not the amount actually reported.  Second, the United States Trustee reaffirmed the contention that an ownership expense of $489 for a second vehicle is inapplicable. The United States Trustee notes that the testimony shows the Suzuki is in very poor mechanical condition and is being insured merely so the Debtors' adult son can operate it.  The United States Trustee also notes that the Debtors do not pay any loan or lease payments on this vehicle.

---

[9] As noted previously, Mr. Meade testified at trial that he receives a "yearly bonus . . . [a]lways in February."  (Trial Transcript at 27.)  Mr. Meade's earning statements also reflect the payment of his yearly bonus in February of 2008 for the amount of $9,000; this is the particular bonus that the United States Trustee contends should have been included in the calculation of income.  United States Trustee's Exhibit 6, Earnings Statements for Ronald M. Meade at page 17.

Finally, the United States Trustee contends that although the Debtors claim $1,051.70 per month as involuntary deductions on the Means Test, only $40.82 is actually deducted on an involuntary basis. The United States Trustee points out that the balance is a combination of voluntary 401(k) contributions, 401(k) loan repayments, voluntary 403(b) contributions and a voluntary allotment to a savings account. As such, the United States Trustee contends that the Debtors are claiming deductions to which they are not entitled.

In response the Debtors contend that the Court should follow a common sense approach in looking at the Debtors' monthly income, which would include dividing Mr. Meade's bonus by twelve months rather than six and also take into consideration the fact that Mrs. Meade does not receive a salary two months out of the year. The Debtors also contend that the vehicle ownership expense for the Suzuki was properly taken because the Suzuki was running, tagged, and titled at the time of the bankruptcy filing and the Debtors pay expenses for it. Moreover, although the Debtors concede that Mr. Meade does not own the vehicle he personally uses, the Debtors do note that there are expenses that they incur for his personal use. Finally, although the Debtors concede that an overwhelming majority of cases have found that 401(k) deductions are not payment for secured debt or entitled to priority, the Debtors contend that if the case were filed under chapter 13, the deductions would be allowed.

Under § 707(b)(3), the United States Trustee contends that if the Debtors fairly reported their income and stopped making payments on the timeshare in Myrtle Beach, the Debtors would have, at the very least, $400 per month in disposable income. Furthermore, the United States Trustee contends that if the Debtors eliminated additional excessive or unnecessary

expenses,[10] there would be more than $2,000 per month available to pay their creditors.  Based on these considerations, the United States Trustee reaffirms the original contention that dismissal pursuant to § 707(b)(3) is warranted.

However, the Debtors highlight that the United States Trustee's pleadings fail to point to any fact that shows the Debtors' petition was filed in bad faith.  With respect to the United States Trustee's contention that the totality of the circumstances show abuse, the Debtors reaffirm the contention that but for custody of their grandchildren as the result of their son's substance abuse problems, the Debtors were paying their living expenses and other obligations. The Debtors contend that dismissal and the resulting placement of their grandchildren in foster care goes against sound social policy and congressional intent.  Finally, the Debtors ask the Court to consider that § 707(b)(3) uses the word "may" rather than shall, and as such, provides discretionary authority for the Court in determining whether to dismiss.  Accordingly, the Debtors note that since the 401(k), 403(b), medical expense plan and loan payments would all be deductible under chapter 13, which in this particular case would reduce the amount available to creditors to less than zero, the Court should consider that there is no benefit to seeing this case converted to chapter 13.

CONCLUSIONS OF LAW

This Court has jurisdiction over this proceeding by virtue of the provisions of 28

---

[10] The United States Trustee specifically notes that the Debtors seek to deduct from their income or include as expenses Mr. Meade's 401(k) contribution of $119.30 per month, repayment of the 401(k) loan at $1,011.70 per month, Mrs. Meade's 403(b) contribution of $225 per month, Mrs. Meade's credit union deduction of $50 per month, and the $250.03 per month that is taken for Mr. Meade's flexible spending account with his employer.

U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District

Court on July 24, 1984.  A motion to dismiss for abuse is a matter concerning the administration

of the estate and a "core" bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(A).

Pursuant to 11 U.S.C. § 707(b)(1), the Court "may dismiss a case filed by an

individual debtor . . . whose debts are primarily consumer debts . . . if it finds that the granting of

relief would be an abuse of the provisions of this chapter."  Significantly, the 2005 Amendments

to the Bankruptcy Code eliminated the requirement that the Court find a *substantial* abuse and

also eliminated the prior presumption in favor of granting chapter 7 relief.  *See* Bankruptcy

Abuse Prevention and Consumer Protection Act, § 102(a)(1) ("BAPCPA").  BAPCPA added to

the Code §§ 707(b)(2) and (3), the former of which provides a calculation to determine whether

the presumption of abuse arises,[11] which the Court is directed to consider in determining under §

707(b)(1) whether granting chapter 7 relief in a particular case would be an abuse.  If the

presumption of abuse does not arise, or if such presumption is rebutted, § 707(b)(3) provides that

the courts may then consider whether a debtor filed his or her petition in bad faith and whether

the totality of the circumstances of a debtor's financial circumstances indicates an abusive filing.

So far there seems to be little case authority on the issue of burden of proof on a

post-BAPCPA motion to dismiss for abuse pursuant to §§ 701(b)(2) or (b)(3).  The Bankruptcy

Court for the Northern District of Ohio has held that "[i]n either instance, the party bringing the

action for dismissal carries the burden of proof."  *In re Witek*, 383 B.R. 323, 326 (Bankr. N.D.

---

[11] Under § 707(b)(2) the presumption of abuse arises if a debtor's current monthly income reduced by certain enumerated expenses, multiplied by 60, is not less than the lesser of "(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575, whichever is greater; or (II) $10,950."  The amounts noted in this formula in the preceding quoted language are those in effect as of the filing date of the Debtors' case.

18

Ohio 2007).[12]  That same decision holds that once a presumption of abuse has arisen, the "burden

of proof to rebut the presumption of abuse is on the debtor."  383 B.R. at 330.  An early 2009

decision from the Bankruptcy Court for the Northern District of California considering a motion

to dismiss under § 707(b)(3) based on "the totality of circumstances" also held that the burden of

proof must be borne by the party moving for dismissal.  *In re Lamug*, 403 B.R. 47, 53 (Bankr.

N.D. Cal. 2009).  This Court certainly agrees that the burden of proof is clearly upon the debtor

to rebut a presumption of abuse which has arisen under § 707(b)(2).  It further agrees that as a

general proposition the burden of proof should be imposed upon the party asserting that a

chapter 7 filing is abusive to prove that contention.  It believes, however, that this general

proposition ought to be subject to one qualification, which is that when a presumption of abuse

would arise under (b)(2) based on a debtor's income and allowed expenses according to the

prescribed Internal Revenue Service "national standards" and "local standards" guidelines,

which comprise Lines 19A thru 24 of the (01/08) version of Form 22A, but the debtor asserts

that other "necessary expenses" or permitted deductions for debt repayment, which comprise

Lines 25 thru 44 of such form, negate the presumption of abuse, the burden of proof as to those

deductions ought to be placed on the debtor.  The reasons for this conclusion are that (i) these

categories comprise information more readily available to the debtor than to any other party in

interest and deal with fact intensive issues which are unique to the debtor, and (ii) such expenses

are in the debtor's interest to make as large as possible in order to avoid a presumption of abuse

---

[12] The *Witek* decision followed an earlier decision from the same court to the same effect
with respect to a motion seeking dismissal under § 707(b)(3) only.  *In re Wright*, 364 B.R. 640,
643 (Bankr. N.D. Ohio 2007).  An unpublished decision by Judge Anderson of this Court is to
the same effect.  *In re Barker*, Case No. 06-60835 at 4-5, a decision available on this Court's
website (Bankr. W.D. Va. June 12, 2007).

arising.  In short, these expenses are very much like the "special circumstances" which a debtor

must prove by a preponderance of the evidence to rebut a presumption of abuse which has arisen

and therefore might reasonably be said to partake more of the nature of affirmative defenses to a

motion to dismiss rather than elements of the presumption itself.  Furthermore, to impose the

burden of proof upon the party moving for dismissal to establish, for example, that claimed

additional telecommunications services in Line 32 are not "necessary for [the debtor's] health

and welfare or that of [his/her] dependents" would require such party to try and prove a negative.

It makes more sense to require the debtor to prove both that such additional claimed expenses are

actually being incurred and that they are reasonably "necessary" for the health and welfare of the

household rather than obliging the United States Trustee to try and prove the opposite.

I.    Presumption of Abuse Arising from 11 U.S.C. § 707(b)(2).

As indicated above, it is necessary to determine initially whether a presumption of

abuse arises based on the Debtors' income and allowable living expenses.  The parties have

stipulated that their aggregate income exceeds "the applicable stated median family income of

$87,546 for the debtors' household of six."  (Stipulation ¶ 4.)  By reason of such fact a statutory

presumption of ability to pay their creditors arises pursuant to § 707(b)(2) when the Debtors'

current monthly income, less the Debtors' monthly expenses under the National and Local

Standards along with any additional reasonable necessary average monthly expenses (the "net

disposable income"), multiplied by sixty, is at least a minimum amount calculated according to a

formula set forth in the statute, which is quoted in the immediately preceding footnote.  In this

case, the Debtors' nonpriority unsecured claims, as listed in Schedule F to their petition, total

$137,066.  Twenty-five (25) percent of that amount is $34,266.50, which of course is more than

20

$10,950.  Accordingly, the issue presented under the facts of this case is whether the Debtors'

net disposable monthly income, multiplied by sixty, is at least $10,950, which means that their

net disposable income must be at least $182.50 per month.  As previously noted, according to

their Means Test the Debtors reported a negative monthly disposable income of $1,143.55, so in

order for a presumption of abuse to arise under § 707(b)(2), the Court must determine that as a

result of under reported income or excessive expenses, or a combination of both, the Debtors'

monthly disposable income, properly determined, is at least $1,326.05 more than they scheduled.

     To determine whether that has occurred, the Court will consider each issue raised

by the United States Trustee in turn.

     A.    Mr. Meade's Annual Bonus.

     In February of 2008 Mr. Meade received a bonus from his employer in the

amount of $9,000.  As already noted, Mr. Meade testified that he receives a "yearly bonus . . .

[a]lways in February."  Because the Debtors' bankruptcy filing occurred on May 23, 2008,

which was within six months of such receipt, it is clear that such compensation must be reflected

in their Means Test.  §§ 707(b)(2)(A)(I) and 101(10A)(A).  The parties dispute whether the

amount which needs to be included is the entire $9,000 or one-half of such amount in light of the

fact that the bonus is applicable to twelve months of services rather than only six.  The United

States Trustee asserts that under the plain language of the statute the entire amount of any

income received by the Debtors during the six months preceding filing must be included.  The

statutory wording relied upon is found at § 101(10A)(A), which defines "currently monthly

income" as meaning:

     the average monthly income from all sources that the debtor receives
     . . . without regard to whether such income is taxable income, derived

during the 6-month period ending on—

> (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii)[.][13]

There is judicial authority supporting the United States Trustee's contention.[14]  For their part the Debtors urge the Court to take a "common sense" approach that any such annual bonus relates to services for an entire year and including the entire amount in six months of earnings grossly distorts the actual amount of their monthly income. There is also judicial authority which adopts this logic, at least in the chapter 13 confirmation context of calculating a debtor's projected average monthly disposable income.[15]

While the Court is not inclined to substitute its own common sense for the language of the statute when such language is clear and leaves little room for analysis of Congressional intent, it does not believe that the "plain language" or "plain meaning" of the wording in question compels the result urged by the United States Trustee.  Although Judge Kelley in *Cruz* agreed with the United States Trustee's reading that the Code definition of Current Monthly Income means the total amount of whatever income was received by a debtor within the six month period preceding the filing date divided by six, this Court understands the language differently.  To be specific, this Court believes that the use of the language "average monthly income" is susceptible of two interpretations.  One of them is the understanding reached

---

[13] The Debtors did file such a schedule of their income as required by the statute.

[14] "[Current monthly income] comes from dividing 'income from all sources' during the 6 months prior to the petition date by six; not by first spreading a bonus over twelve months. Whether income is included in CMI is determined by when the debtor *receives* funds, not when they are earned."  *In re Cruz*, 2008 WL 3346583, at *2 (Bankr. E.D. Wis. Aug. 11, 2008).

[15] *In re Foster*, 2006 WL 2621080, at *8 (Bankr. N.D. Ind. Sept. 11, 2006).

22

by Judge Kelley that it simply means total income received by a debtor within the six month

period divided by six to arrive at the "average monthly income."  Another interpretation,

however, is that the use of both "receives" and "derived" means that Congress intended for there

to be some connection between the compensation received and the period of time in which the

applicable services for such compensation were rendered.  As Judge Lundin has noted in his

treatise on chapter 13 bankruptcy, subsection (B) of § 101(10A), which brings into the

calculation of Current Monthly Income "amounts paid by any entity other than the debtor . . . on

a regular basis for the household expenses of the debtor or the debtor's dependents," does not

contain language suggesting a strict temporal boundary of when such amounts are paid.  Keith

M. Lundin, *Chapter 13 Bankruptcy*, *3rd Edition* § 468.1 at p. 468-17 (2000 & Supp. 2007-1).

Under this alternative interpretation of the language, in the analysis of annual bonuses the

amount of the bonus would be prorated over a twelve month term and would be deemed to be

part of a debtor's average monthly income for each month of the year.  This Court believes that

such interpretation doesn't simply apply "common sense", not that it finds anything wrong with

using that to interpret the intended meaning of the Congressional language, but is more in

keeping with what appears to it to be the overarching purpose of the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005, commonly identified as BAPCPA, namely, to

require those who are financially able to make a meaningful payment to their unsecured creditors

to do so as a condition of obtaining a discharge in bankruptcy of their obligations to such

creditors.  The facts of the present case illustrate quite well the practical consequences of the

differences between the parties' positions.  To divide the bonus by six would result in the

Debtors' "currently monthly income" being increased by $1,500 per month over the amount

23

which would be the case had no bonus been paid, but by $750 per month if such bonus is

prorated over a twelve month period.  Dividing such a bonus by six inescapably would result in

the Debtors' "current monthly income" for Means-Test purposes varying by $1,500 per month

based solely on the timing of a bankruptcy filing and therefore would encourage debtors to

arrange their filings according to the circumstance of when an annual element of compensation is

paid.  It is difficult to believe that Congress intended such a result or desired to encourage such

tactics.  The Court believes that it is most likely that Congress assumed that six months was a

sufficiently long period of time in which ordinary variations of most persons' incomes relating to

such factors as overtime compensation, seasonal employment and the like would average out and

generally provide a fair reflection of their respective abilities to pay their creditors.  While the

Court recognizes that Congress established a procedure in § 707(b)(2)(B) whereby "special

circumstances" could be demonstrated by the debtor to rebut a presumption of abuse arising

under § 707(b)(2)(A), the Court agrees with Bankruptcy Judge Kelley that the particular facts

relied upon by a debtor to establish "special circumstances" ought to be of the same nature as the

type of events cited by Congress to illustrate what it had in mind for such term, to-wit:  "a

serious medical condition or a call or order to active duty in the Armed Forces[.]"  §

707(b)(2)(B)(i); *In re Schley,* 2008 WL 3895562, at *2 (Bankr. E.D. Wis. Aug. 22, 2008).  That

subsection ((b)(2)(B)), however, deals with rebutting a presumption of abuse which has arisen in

the preceding subsection ((b)(2)(A)), not how the calculations are made to determine whether

any such presumption of abuse arises in the first place.

        The Court recognizes that its decision to prorate the amount of an annual bonus

received during the six month period preceding the bankruptcy filing over a twelve month period

is an easier one than is the other side of the coin, i.e., doing the same thing when the payment of

the bonus has occurred prior to the six month period preceding such filing.  That situation is not

before the Court in this case, although it is undeniably implicated by the Court's holding on this

point.  The Court will make two observations regarding that situation, however.  First, there is

chapter 13 case authority denying a debtor's attempt to exclude from the chapter 13 Trustee's

and the Court's consideration a similar annual bonus received outside of the six month period

provided by § 101(10A).  *See In re Foster*, 2006 WL 2621080, at *8 (Bankr. N.D. Ind. Sept. 11,

2006).  Second, the concept underlying the Court's ruling on the facts actually before the Court

in this case contemplates a prorated constructive receipt of an annual bonus over the period of

time correlating with the fact that it is an annual bonus.  There are admittedly some logical

difficulties here with projecting in advance a bonus which relates to services actually rendered

during the preceding year.  In that sense the Court is arguably allocating backwards a bonus

received in February 2009 to Mr. Meade's income during four (January thru April, 2008) of the

six months preceding the month of filing (May 2008).  While the Court acknowledges the

conceptual difficulties, it concludes that they are inherent with the larger problem faced by

Congress as well as bankruptcy courts, namely, using past experience to predict what a debtor

will be able to pay in the future from income not yet received or even guaranteed to come.  On

the basis of the foregoing rationale, the Court will increase the amount of the Debtors' "current

monthly income" for purposes of § 707(b)(2)(A) by $750 per month above the amount shown in

their Means Test filed with their petition.

B.      Mrs. Meade's Teaching Income.

Mrs. Meade works as a public school teacher and is paid for her services over a

period of ten months.  The Court understands that the payment for her services is made over

roughly the same period of time during which she provides teaching services.  She is not paid

during two months of the Summer when she is not obliged to provide any services.  While the

Court applies the same analysis as it did to the issue of Mr. Meade's annual bonus, the result is

different because the facts are also different.  Mr. Meade, allowing for periods of paid vacation,

works during each month of the year.  He receives a bonus annually for the services rendered

during that period of time.  In contrast, Mrs. Meade is obliged to render teaching services only

during ten months of the year and is paid for those services roughly in accord with when they are

rendered.  She does not receive any "bonus" for services she provides, but only her contracted

salary.  She apparently is free to do what many public school teachers are commonly known to

do, which is to work at other jobs, often of a seasonal nature, during their summers off.  The fact

that she does not do so does not alter the fact that she could attempt to replace at least partially

her school salary during those months in which she is not employed and does not receive

compensation.  The Court concludes that this type of situation is well within the framework

provided by Congress of looking to the income actually received during the six month period

prior to bankruptcy as the best measure of a debtor's ability to pay creditors.  While the Court

recognizes that this factor also might influence the timing of filing of a bankruptcy petition, it

concludes that such situations at the margins are the inevitable consequence of the Congressional

decision to establish a definite and narrowly defined test to measure when abuse of the

bankruptcy system has been presumptively established.  Accordingly, Mrs. Meade's annual

teaching income will not be divided by twelve but the full amount of such income received

during the six month period preceding bankruptcy will be used.  This determination follows and

adopts the decision of Bankruptcy Judge Kelley on this same issue in *Schley*, 2008 WL 3895562,

at *3.  The result is that the Debtors' current monthly income will be increased by $403.12 over

the amount reported in their Means Test.

C.      Mr. Meade's Employer Provided Car and the Suzuki.

The testimony was to the effect that Mr. Meade was free to use the vehicle

provided to him by his employer for both business and personal purposes.  According to the

earnings statement for Mr. Meade for the period ending on December 16, 2007, which was

within the six month period preceding the bankruptcy filing as defined by § 101(10A), he

received compensation designated as "auto" in the amount of $501.06 and a corresponding

deduction of the same amount as being withheld by the employer for the same designated reason,

"auto."  Although the exact calculation of Mr. Meade's income which was included in the

Debtors' Means Test has never been provided to the Court, it appears fairly clear that this

personal use compensation for the company vehicle was included in that determination.  The

Court has found that Mr. Meade's employer provided additional compensation to him for the

deemed value of his personal use of the company vehicle, which compensation was withheld

from what he actually received as payment to the employer for such non-business use of the car.

While this results in a roughly "wash" transaction, that would not be entirely the case for at least

Mr. Meade, and perhaps for his employer as well, due to the income and possible employment

tax liabilities resulting from the payment of such compensation.

The evidence indicated that the Suzuki automobile was the vehicle which had

been used by Mrs. Meade prior to the bankruptcy filing for her transportation needs.  Mrs.

Meade's need for a reliable vehicle is not in dispute, not only for her job commuting, but also for

the transportation needs of the Debtors' grandchildren who resided with them before bankruptcy and continue to do so, plus an additional one who has come to live with them since their filing. The clear reason that the Debtors purchased the Nissan minivan shortly before their bankruptcy filing, even though their financial condition was then very stressed, was because the Suzuki "just kind of wore out, broke down." (Trial Transcript at 31.) As previously noted, it is not even clear from the testimony whether the vehicle had been made operational by the time the Debtors filed their petition. While the Debtors have continued to own this vehicle and pay the cost of insuring it, the reality is that the vehicle is in the possession of and is regularly used by their adult son who is not a member of their household. The Debtors also report owning several other old vehicles as detailed in footnote two of this decision. The question in dispute between the parties is whether the Debtors are entitled to claim for Means-Testing purposes a $489 monthly vehicle expense for the Suzuki or the personal use component of the car provided by Mr. Meade's employer.

Counsel for the Debtors points out that Chief Judge Krumm of this Court in a chapter 13 case, *In re Hylton*, 374 B.R. 579, 583-84 (Bankr. W.D. Va. 2007 ), held that a debtor couple were entitled to claim the full Internal Revenue Service sanctioned ownership deductions for the two cars they owned irrespective of whether they owned them free and clear of any unpaid secured obligations against them or had continuing monthly payment obligations against them. Counsel for the United States Trustee takes issue with this holding and notes that it is currently on appeal. The question is a difficult one and if I were writing on a clean slate, it is possible that I might take a different view of the issue than has Chief Judge Krumm. It is not a clean slate, however, and I believe it is important that the same rule of law be applied in

28

recurring situations of this kind by the different divisions of the same Court except where the

need to do otherwise is quite compelling and almost inescapable, so that a determination of an

issue so fundamental as whether a bankruptcy petition is or is not presumed to be abusive is not

dependent upon the identity of which judge hears the motion.  This approach is particularly true

where there is substantial authority supporting the decision which has already been made,

including decisions from Circuit Courts of Appeal other than controlling authority of the Circuit

Court to which this Court is subordinate.  That is the situation presented here.  *See, e.g., In re*

*Tate*, 571 F.3d 423, 426-28 (5th Cir. 2009).  *Accord, In re Lynch*, 368 B.R. 487, 491 (Bankr.

E.D. Va. 2007) (Tice, C.J.) *and In re Crawley*, 412 B.R. 777, 782-83 (Bankr. E.D. Va. 2009)

(Mitchell, J.)  Accordingly, this judge will follow the rule announced in *Hylton* until and unless

its holding is abrogated by an appellate court to which an appeal from this Court lies.  That does

not necessarily decide the issue before this Court though because the controlling facts here are

not the same as those presented in *Hylton*, which involved two vehicles which were

unquestionably owned and being used by the debtors regularly for their transportation needs.  In

this case, however, the Suzuki, even if it was operational at the time of the petition filing, which

is unclear from the evidence, was not being used regularly at such time by either of the Debtors

or anyone who was then a member of their household.  Nevertheless, the Debtors were clearly

using two vehicles for their combined household needs.

　　　　　Line 22A of the Means Test specifically directs debtors to "[c]heck the number of

vehicles for which you pay the operating expenses or for which the operating expenses are

included as a contribution to your household expenses in Line 8."  Although there can be little

question that Mr. Meade is receiving a valuable benefit from his employer by being permitted to

use the company vehicle for his personal transportation needs, for which he is only obliged to

pay the tax liabilities for the deemed value of such personal use, a relatively modest amount of

$501.06 for an entire year, with the bulk of the actual cost of such vehicle obviously being

allocated to his business use of it, still it cannot be denied that such amount is an operating

expense paid by Mr. Meade, albeit from the compensation "bonused" to him for that purpose

which is included in his current monthly income as determined for Means-Testing purposes.  The

statutory scheme devised by Congress makes no distinction, however, based on the actual

amount of the operating expenses paid or the value of the vehicle owned or leased, so the

question of actual ownership of the vehicle is not ultimately determinative.  The Court observes

also that there is a definite logic to such a scheme and that it does not yield an absurd result.

Specifically, restricting bankruptcy debtors to ownership deductions based on whether they have

payment obligations on their vehicles would create a perverse incentive to prospective filers

owning vehicles approaching the end of their economically useful lives to go out and purchase

newer vehicles and incur additional debt before actually filing their petitions so that they, rather

than their creditors, could receive the benefit of the difference between an actual vehicle expense

deduction and a higher one allowed by law.  Moreover, such a system would penalize the most

frugal of bankruptcy debtors or those with relatively higher non-transportation related living

expenses in favor of those choosing or needing to devote more of their resources to newer and

more expensive vehicles.  Furthermore, such a policy choice would favor higher income debtors

who could afford more expensive vehicle payments over those who could manage only very

minimal vehicles which might well entail higher expected repair and maintenance costs.  Finally,

it would avoid the unfairness which would be suffered by debtors who file while still operating

unreliable vehicles which they own but which later wear out after filing and then must be replaced. If a debtor's filing has been deemed abusive as a result of the difference between an actual ownership deduction and a standard one allowed by statute, he could find himself saddled with a chapter 13 plan payment without the financial means to replace a worn out and useless vehicle. So, while on first impression one might question the wisdom or even "common sense"of allowing a deduction based on the cost of acquiring a vehicle by one who already owns a vehicle, there is a solid foundation supporting both the rationality and equity of such a concept. Accordingly, the Court concludes that the Debtors are entitled to the $489 vehicle deduction claimed by them on their Means Test and will not make any change on that account.

D.      Retirement Account Contributions and Loan Payments.

While counsel for the United States Trustee expends considerable effort arguing this issue in her post-trial memoranda with respect to the § 707(b)(2) (presumption of abuse) count of the Motion, it is not a contention which was advanced in such Motion as to such count. Such Motion was never amended prior to trial to make such a contention and therefore it will not be taken up by the Court in its decision upon such count. While the Court agrees that such issues are important recurring ones which ought to be resolved, it concludes that under the circumstances presented in the Motion now before this Court, they would be more properly addressed in the (b)(3) count under the "totality of circumstances" test, where the United States Trustee did raise the issue.

E.      Housing and Utilities Adjustment and Telecommunications Expenses.

Line 21 of the Means Test deals with "Local Standards: housing and utilities; adjustment." The Debtors include in this category $22 for "internet needed for work." The

United States Trustee does not challenge this particular expense per se but asserts that it should

be included instead at Line 32, which provides for "Other Necessary Expenses:

telecommunications services."  The Debtors had already placed a $250 figure at this line and the

United States Trustee asserts that this figure is too high and that the combined amount for

telecommunications services, including the $22 internet charge, should be only $72, which

would have the practical effect of reducing the Debtors' original figure of $250 to $50.  The

Court concludes that the internet charge should come within the category of telecommunications

services rather than utility expense.  The United States Trustee, other than contending that the

expense is excessive, has not offered specific argument on this point.  Ms. Kidd, the United

States Trustee's witness, testified that the deduction from $250 to $50 is to allow for one family

emergency telephone and that she had been instructed by trial counsel for the United States

Trustee to make that adjustment.  (Trial Transcript at 116.)  To note what ought to be obvious,

testimony by a party's witness which has no basis cited in the testimony other than the

instruction of trial counsel to take a particular position is entitled to precious little, if any,

probative weight.

As noted by this Court in its decision in the *Minahan*[16] case, which was a chapter

13 case, Line 37 in Form 22C, which is the equivalent of Line 32 in Form 22A, is intended to

allow for telecommunications services which exceed the cost of basic telephone service to the

extent that such additional services are necessary for the "health" of the debtors and their

dependents.  The cost of basic telephone service is included in the Internal Revenue Service

standards for general living expenses.  In the *Minahan* decision this Court, as a finding of fact,

---

[16] *In re Minahan*, 394 B.R. 116, 124-25 (Bankr. W.D. Va. 2008).

allowed an additional $100 per month beyond basic telephone service for telecommunication

services, finding that the debtors had not established that the much larger amounts they claimed

were "necessary" expenses.  While the Court agrees with the United States Trustee that the $250

figure claimed by the Debtors is excessive, under the facts of this case it is not necessary for it to

determine the magnitude of that excess.

F.       Tax Expense.

During the six month period preceding the month in which the Debtors'

bankruptcy filing occurred they received income tax refunds for their 2007 tax year in the

amounts of $5,071 federal and $380 from the Commonwealth of Virginia.  For the 2008 tax year

in which their filing occurred they received somewhat less, $4,505 federal and $196 state.  Other

bankruptcy courts have noted that Line 25 deals with actual tax liability, not simply the amounts

withheld regularly from paychecks which are subject to some discretion on the part of debtors

and potential abuse by them.  *See In re Hale*, 2007 WL 2990760, at *2 (Bankr. N.D. Ohio Oct.

10, 2007) ("income tax withholding is not the same as actual tax liability, and can be

manipulated by taxpayers to produce excess withholding and a refund"); *In re Barbour*, 2009

WL 3053697, at *6 (Bankr. E.D. N.C. Sept. 18, 2009) (noting that a debtor's "overwithholding

of taxes skews the computation of CMI if tax refunds are not considered").  This Court

concludes that such decisions are correct and that Line 25 ought to be adjusted downward to

reflect what the income tax expense figure would be if their withholding were exactly aligned

with their income tax liability.  This Court has found that use of the 2008 tax refund amounts,

although of course not being figures which could have been known to the Debtors at the time of

filing, are the fairest indication of the Debtors' ability to pay as of that time.  It has determined

33

that the correct Line 25 figure is $2,280.62 which exceeds the scheduled amount of $2,535.16 by

$254.54.

G.      Childcare Expense.

Line 30 of the Means Test covers "Other Necessary Expenses: childcare."  The

Debtors claimed an expense of $275 per month.  The United States Trustee asserts that the figure

ought to be $150 per month.  Where this particular amount comes from is neither made clear

from the evidence[17] nor addressed specifically in counsel for the United States Trustee's written

arguments.  Although documentation of such expense was lacking, Mrs. Meade testified that

their true expense was actually higher than the amount claimed.  While the Debtors' evidence

does not clearly establish the claimed expenditure, much less a higher one, the Court will treat

the failure to address such expense in the post-trial written arguments to be a waiver of such

issue by the United States Trustee.

H.      Support of Family Members.

Line 35 of the Debtors' Means Test is titled "Continued contributions to the care

of household or family members" and contains the following instructions:  "Enter the total

average actual monthly expenses that you will continue to pay for the reasonable and necessary

care and support of an elderly, chronically ill, or disabled member of your household or member

of your immediate family who is unable to pay for such expenses."  The Debtors included a

figure of $208 on this line, which appears to relate to recurring financial assistance provided by

---

[17]  Ms. Kidd did testify that she thought the Debtors' number was "probably overstated"
based on her review of the 2008 tax return which claimed $512 for childcare expenses for the
entire year of 2008 and a receipt of $414 for the months of January, February, and April of 2009.
(Trial Transcript at 87.)

the Debtors to or for the benefit of their adult son, who as a result of certain issues of a medical

nature is not able to support himself fully.  The Motion asserts that the amount ought to be

eliminated entirely on the basis that the son is an adult and the Debtors' creditors shouldn't be

expected to subsidize his support.  There appears to be no real dispute that the son does need

some support and that the Debtors provide such on a regular basis, although its amount is not

readily apparent.  Again as to this category of expense, counsel for the United States Trustee has

not argued the point in her post-trial briefs.  Accordingly, the Court will treat this contention also

as having been waived.

      I.       Additional Food and Clothing Expense.

      The Debtors included a figure of $100 at Line 39, which provides for

substantiated "Additional food and clothing expense."  The United States Trustee points out that

this amount is limited to a maximum allowable amount with respect to the facts of this case of

$59 per month.  Counsel for the Debtors correctly concedes this issue.  Accordingly, the amount

of the Debtors' disposable income must be increased by $41 over the amount originally claimed

in their Means Test.

      J.       Charitable Contributions.

      The Debtors claim to make charitable contributions of $10 per month.  The

United States Trustee objects that such amounts are not documented.  Based on the testimony of

Mrs. Meade, the Court concludes that this deduction is proper.  Accordingly, the Court will not

change the Debtors' disposable income on this account.

      K.      Summary of Adjustments Made by Court to Debtors' Means Test Income.

      The Court has concluded that the Debtors' reported income on their Means Test

35

should be increased by $750 per month to account for Mr. Meade's annual bonus and by $403.12

per month because the Code does not permit Mrs. Meade's teaching salary to be prorated over a

twelve month period rather than the ten month period over which she actually provides services.

It also has concluded that their allowable expense deductions for the purpose of Means Testing

must be reduced by $254.54 per month to account for their substantial income tax refunds and by

$41 per month for claimed additional food and clothing expense for their household members

exceeding the amount permitted by the Code.  The aggregate total of these adjustments is

$1,448.66 per month, representing additional disposable income available to pay creditors above

the amount reported on the Debtors' Means Test.

> L.      Is the Debtors' Chapter 7 Filing Presumptively Abusive?

The amount of $1,448.66 just noted exceeds the $1,326.05 figure previously

noted by the Court of additional disposable monthly income which would be necessary to pay

the Debtors' unsecured creditors at least $10,950 for the presumption of abuse to arise with

respect to the Debtors.  Accordingly, the Court concludes that the Debtors' chapter 7 filing is

presumptively abusive under § 707(b)(2).

Although Congress has provided that a presumption of abuse under § 707(b)(2)

may be rebutted, it has clearly signaled its intent that bankruptcy courts not use the discretion

provided by statute to dilute the effectiveness of the chapter 7 gate created by such presumption.

Section 707(b)(2)(B) provides in part as follows:

> (i) In any proceeding brought under this subsection, the presumption
> of abuse may only be rebutted by demonstrating special
> circumstances, such as a serious medical condition or a call or order
> to active duty in the Armed Forces, to the extent such special
> circumstances that justify additional expenses or adjustments of
> current monthly income for which there is no reasonable alternative.

36

(ii) In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide—

(I) documentation for such expense or adjustment to income; and

(II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.

(iii) The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.

For the purpose of this decision the Court will assume that the combination of the Debtors' son's problems and their taking their four grandchildren into their household may constitute "special circumstances" within the meaning of this subsection[18] even though it is not persuaded that their son's problems and their efforts to deal with them are the principal cause of their financial predicament.  Their own testimony would not support such a determination and no specific evidence has otherwise been offered otherwise to justify such an explanation.  In any event, however, the Court's determination that the presumption of abuse has been established does not depend upon disallowance of the additional living expenses which the Debtors claimed other than the agreed reduction at Line 39 of $100 to $59 for "Additional Food and Clothing Expense."  Even if this amount were allowed at the claimed amount of $100, that adjustment would not be sufficient to reverse the presumption of abuse created by the statute.  Accordingly, the Court concludes that the Debtors have not rebutted the presumption of abuse created under §

---

[18] For a general account of various factual situations which bankruptcy courts have determined to constitute "special circumstances" within the meaning of the statute, *see* 6 *Collier on Bankruptcy* ¶ 707.05[2][d] at pp. 707-49 to 707-51 (15th ed. rev.).

707(b)(2).

II.    Dismissal for Abuse Pursuant to 11 U.S.C. § 707(b)(3).

Section 707(b)(3) of the Bankruptcy Code provides as follows:

In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

The Court notes that under the wording of this subsection a determination of whether a particular bankruptcy filing constitutes an abuse of chapter 7 based on a debtor's bad faith or the totality of his or her financial situation is only to be made if the presumption of abuse "does not arise or is rebutted."[19]  This language may be contrasted with a dismissal for cause under § 707(a) which contains three non-exclusive examples of good cause.  The language of paragraph (b)(3) seems to bespeak an intent for courts to take up a dismissal pursuant to its provisions only in cases where the presumption of abuse under (b)(2) never arises or does arise but is satisfactorily rebutted.  While the Court recognizes that it might be helpful both in any appellate litigation of this case and more generally for other cases to set forth its legal conclusions on recurring issues of importance which are presented under the facts of this case, such as the surrendered timeshare

_____

[19] There seems to be a technical error in the wording of the statute in that the presumption under subparagraph (A)(i) is under paragraph (b)(2), not (b)(1).  Nevertheless, the intent of Congress seems clear.

38

interest in the vacation condominium[20] and the repayment of a loan to a debtor's 401(k)

retirement account which would be fully satisfied during the term of a possible chapter 13 plan,[21]

it concludes that it ought not to do so when the wording employed by Congress seems to disfavor

such an approach when it is not necessary for the Court to rule dispositively on the Motion

before it.

CONCLUSION

Based on the Court's findings of fact and conclusions of law that the Debtors'

chapter 7 petition is abusive by reason of the presumption provided by Congress in §

707(b)(2)(A) and that presumption has not been rebutted pursuant to § 707(b)(2)(B), it will grant

by an order to be entered contemporaneously with the signing of this decision the United States

Trustee's Motion to Dismiss, but will stay such order for a period of thirty days to permit the

Debtors, if they wish to do so, to file a motion to convert their case to one under chapter 13.

Enter this the 13th  day of November, 2009.

_William F. Stone, Jr._

_____

UNITED STATES BANKRUPTCY JUDGE

---

[20] *See , e.g., In re White,* 409 B.R. 330, 336 (Bankr. D. Md. 2009) ("This Court holds that although monthly payments on surrendered secured property may be properly deducted in order to determine eligibility for discharge under the Chapter 7 means test, they are not properly deductible in calculating expenses to determine a Chapter 13 debtor's projected disposable income.").

[21]  *See In re Phillips*, --- B.R.----, 2009 WL 3019815, at *9 (Bankr. S.D. Ohio Sept. 22, 2009).  *See also*, *In re Barker*, *supra* n. 12.